**UNITED STATES of America ex rel. Theodore R. ANDERSON, Plaintiff–Appellant,**

v.

**NORTHERN TELECOM, INC., Defendant–Appellee.**

No. 93–35520.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 3, 1994.

Decided April 20, 1995.

As Amended May 25, 1995.

Michael R. McCarthy (argued), David W. Ballew (on the briefs), Davies, Roberts & Reid, Michael A. Goldfarb and Matthew F. Davis (on the briefs), Rohan, Goldfarb & Shapiro, P.S., Seattle, WA, for plaintiff-appellant.

Gregory J. Kerwin (argued), and David G. Palmer (on the briefs), Gibson, Dunn & Crutcher, Denver, CO, for defendant-appellee.

Before: ALARCON, BEEZER and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

The district court dismissed most of the *qui tam* claims in this case for lack of subject matter jurisdiction, on the ground that the 1986 amendment to the False Claims Act did not apply retroactively. One claim was dismissed on summary judgment, because the plaintiff did not establish a prima facie case of fraud. We conclude that the retroactivity analysis was mistaken, because the relevant conduct took place after the effective date of the amendment. We agree, however, that no prima facie case of fraud was made out on the claim dismissed on summary judgment.

## I. Facts

Northern Telecom sells digital telecommunications switching systems, called "switches," worth about $2 million each to the military. The gist of Mr. Anderson's claims is that Northern Telecom knew the switches were defective, but tried to palm them off on the government.

All the switches in this case were delivered, invoiced and paid for before 1986, except for one switch at Letterkenny Army Depot. The False Claims Act was amended in 1986 in a way that changed the consequences if the relator told the government about the fraudulent claim before bringing suit. Mr. Anderson left Northern Telecom's employ. In 1988, he told the FBI about Northern Telecom's allegedly fraudulent practices. The United States investigated, and then chose not to pursue the claim. In 1990, Mr. Anderson sued under the *qui tam* provisions of the False Claims Act. The government chose not to intervene.

The district court dismissed the claims based on the switches sold and paid for before 1986, on the ground that the 1986 amendments to the False Claims Act applied prospectively to false claims made after the date of the amendment. Because Northern Telecom had submitted its allegedly false claims before 1986, the district court applied the pre–1986 law. Under the old law, Mr. Anderson's report to the FBI would have precluded his subsequent *qui tam* lawsuit.

The Letterkenny Army Depot switch was paid for after 1986, so the district court applied the new law. The court granted summary judgment for Northern Telecom on this switch, because Mr. Anderson had no evidence of fraud.

## II. Analysis

■ We have jurisdiction over the district court's final judgment under 28 U.S.C. § 1291. We review the district court's grant of summary judgment and its statutory interpretation *de novo*. *Dowling v. Davis*, 19 F.3d 445, 447 (9th Cir.1994).

The False Claims Act enables a private individual to sue a firm which presents a

fraudulent claim to the government. The action is brought in the name of the government, and is served on the government. The government can take over prosecution, which affects the size of the bounty the relator gets if the action succeeds. 31 U.S.C. § 3730. Before 1986, if the government did not elect to proceed with the action itself, the court had to dismiss the action if it was based on evidence the government already had when the lawsuit was filed:

> Unless the Government proceeds with the action, the court shall dismiss an action brought by the person on discovering the action is based on evidence or information the Government had when the action was brought.

31 U.S.C. § 3730(b)(4) (1982).

If this old law applies, then Mr. Anderson's *qui tam* action as to Northern Telecom's alleged pre–1986 false claims was properly dismissed, because "the action is based on evidence or information the Government had when the action was brought." Although the only reason the government had the information in 1990, when the action was brought, is that Mr. Anderson informed the FBI in 1988, the pre–1986 statutory bar operated even though the relator himself was the source of the information. *Pettis ex rel. United States v. Morrison–Knudsen Co.,* 577 F.2d 668, 669 (9th Cir.1978).

Congress changed the law in 1986. The old language barring recovery if the government had "information" before suit was filed was changed to an entirely new scheme, in which recovery was barred if the claim was based on "public disclosure," unless the relator was "an original source of the information." Here is the new statutory language at (e)(4), which entirely replaces the old subsection (b)(4) quoted above:

> (4)(A) No court shall have jurisdiction over an action under this section based upon the *public disclosure* of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, *unless* the action is brought by the Attorney General or *the*

> *person bringing the action is an original source of the information.*

> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4) (1988) (emphasis added).

Under this new provision, "public disclosure" rather than "information the Government had" bars the claim. *Wang v. FMC Corp.,* 975 F.2d 1412, 1416 (9th Cir.1992); *United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416 (9th Cir.1991). The claim is saved, despite "public disclosure," if the relator "is an original source." That means that the relator (1) has "direct and independent knowledge of the information on which his allegation is based," and (2) "has voluntarily provided the information to the Government before filing" his *qui tam* action. *Wang,* 975 F.2d at 1417, *citing* 31 U.S.C. § 3730(e)(4)(B). The relator does not have to prove that he is an "original source" unless there has been "public disclosure." *Id., citing* 31 U.S.C. § 3730(e)(4)(A); *Hagood,* 929 F.2d at 1420.

The district court decided in the case at bar that the old law applied. The only analysis done was of whether "the action is based on evidence or information the Government had when the action was brought." No analysis was performed under the "public disclosure" and "original source" scheme of the new law, and the briefs do not discuss how the new law would apply to the evidence. Because we conclude that the new law should have been applied, we remand so that the district court can perform the analysis under it.

## A. *Retroactivity.*

Statutes ordinarily do not operate retroactively, that is, to change the legal consequences of past conduct. An application is retroactive if "it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose

new duties with respect to transactions already completed." *Landgraf v. USI Film Products,* — U.S. —, —, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229 (1994).

When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would *impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.* If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Landgraf,* — U.S. at —, 114 S.Ct. at 1505, emphasis added. *See also Murphy v. FDIC,* 38 F.3d 1490, 1501 (9th Cir.1994) (en banc).

In *United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416 (9th Cir.1991), we applied the 1986 amendment to a case brought after 1986, where the disclosure to the government was made prior to 1986. We held that there was no "public disclosure" to serve as a bar to jurisdiction under 31 U.S.C. § 3730(e)(4)(A), so it did not matter whether the relator was an "original source" under § 3730(e)(4)(B). *See also Wang,* 975 F.2d at 1416. Although this appears to be a retroactive application of the 1986 amendment, we did not consider, discuss or decide the retroactivity issue in *Hagood.* The case came down before *Landgraf,* and the retroactivity issue was not raised by the parties.

The Sixth Circuit has held that the 1986 amendments to the False Claims Act do not apply retroactively. *United States v. TRW, Inc.,* 4 F.3d 417, 423 (6th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1370, 128 L.Ed.2d 47 (1994); *United States v. Murphy,* 937 F.2d 1032 (6th Cir.1991). *TRW* (not *Murphy* ) addressed the amendment at issue

in this case. In *TRW,* the relator disclosed the false claim before the 1986 amendment saved him from the jurisdictional bar, while in the present case, the relator did not make his disclosure until after the amendment expanded jurisdiction. In the case at bar we do not reach the question of whether the amendment applies retroactively. We assume without deciding that the amendment is prospective in its effect, as the Sixth Circuit held.

 The issue is, prospective to what? The Supreme Court has taught that the proper focus of retroactivity analysis is the conduct that would be affected by the law. *Landgraf,* — U.S. at —, 114 S.Ct. at 1505. Retroactive application of a law means that it changes the legal consequences of conduct that took place before the law went into effect. If, however, the law changes the legal consequences of conduct that takes place after the law goes into effect, the law operates on that conduct prospectively. That is, so long as Congress establishes the legal consequences of conduct prior to the conduct taking place, there is no issue of retroactivity. Congress presumptively tells people what to do in the future, but absent clear congressional intent, does not change the legal consequences of what they have done before it spoke. *Landgraf,* — U.S. at —, 114 S.Ct. at 1505.

In the case at bar, Northern Telecom submitted the allegedly false claims before the 1986 amendment became effective. But the 1986 amendment did not change the legal consequences of Northern Telecom's conduct. If Northern Telecom really did submit a fraudulent claim, it became liable and remained liable to the government and to potential *qui tam* relators. Congress changed the consequences of Mr. Anderson's conduct, not Northern Telecom's, in 1986. Had Mr. Anderson gone to the FBI with his information before the 1986 amendment, his subsequent claim would have been barred by his own disclosure. *Pettis,* 577 F.2d at 669. After the amendment, his disclosure to the FBI did not bar his claim. Because Mr. Anderson acted after the amendment, and the amendment changed the consequences only of his conduct, application of the amend-

ment to his conduct is prospective, not retroactive. *Cf. McGinnis v. Kentucky Fried Chicken of California,* 42 F.3d 1273, 1275 (9th Cir.1994) (vacating punitive damages award because, although statute authorized punitive damages at the time of trial, it did not authorize them at the time KFC engaged in the wrongful conduct for which the punitive damages were awarded). Whether the amendment is retroactive or prospective only, Mr. Anderson's conduct took place after it, so benefitted from the new law.

We conclude that the district court erred in dismissing Mr. Anderson's claims for lack of subject matter jurisdiction in reliance on the pre–1986 version of the False Claims Act. We remand the case so that the district court may decide upon the claims under the amended version of the Act.

B. *Was summary judgment proper on the Letterkenny switch?*

The only switch as to which the district court reached the merits of the dispute was the one sold to Letterkenny Army Depot. Northern Telecom sent invoices to the Army for this switch in 1987 and 1989. Although the district court decided which law applied on the basis of when the claims were paid, we need not reach the question of whether the invoice date, the acceptance date or the payment date controls, because all dates relevant to the Letterkenny switch occurred after the 1986 law became effective.

 The district court granted summary judgment in favor of Northern Telecom, because Mr. Anderson failed to establish a genuine issue of material fact as to whether Northern Telecom submitted a false claim in violation of the statute. We review *de novo, Dowling,* 19 F.3d at 447, and affirm.

 "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). It is "not a disfavored procedural shortcut," but has replaced pre–1938 devices as the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the at-

tendant unwarranted consumption of public and private resources." *Id.* at 327, 106 S.Ct. at 2555. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (emphasis in original).

> The judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fairminded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Id.* at 252, 106 S.Ct. at 2512. If the facts make a claim "implausible," the non-movant must present "more persuasive evidence than would otherwise be necessary" in order to defeat a summary judgment motion. *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). Although the evidence must be viewed in a light most favorable to the opponent of the motion, and all reasonable inferences must be drawn in his favor, the inferences are limited to those upon which a reasonable jury might return a verdict. *T.W. Elec. Svc., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987).

 For a *qui tam* action to survive summary judgment, the relator must produce sufficient evidence to support an inference of knowing fraud. *Wang,* 975 F.2d at 1420. "The requisite intent is the knowing presentation of what is known to be false," as opposed to innocent mistake or mere negligence. *Hagood,* 929 F.2d at 1421. "Bad math is no fraud," proof of mistakes "is not evidence that one is a cheat," and "the common failings of engineers and other scientists are not culpable under the Act." *Wang,* 975 F.2d at 1420–21. The statutory phrase

"known to be false" "does not mean 'scientifically untrue'; it means 'a lie.'" *Id.* at 1421.

The gist of Mr. Anderson's claim is that all the switches to which his lawsuit refers lacked proper grounding, so they would not work properly, and could be dangerous if certain parts were touched at certain times. The grounding on a number of switches was changed by a later enhancement, after deficiencies in performance were discovered. Grounding the switch better apparently reduced noise and hum, reduced the error rate in transmissions of digital data, and gave better protection and isolation to switch components.

Northern Telecom's senior electrical engineer on the project stated in his declaration that the Letterkenny switch was different from the others, and had the new grounding feature built in from the beginning. Mr. Anderson's evidence included a Northern Telecom internal document called "1987 Enhanced Grounding Schedule" which showed that something was planned for the Letterkenny switch in March 1987. Northern Telecom's engineer explained in his declaration that this was not the same grounding fix as was needed on the older switches, but was a different and simpler change.

The engineer's declaration does not show that the Letterkenny switch had no defects. But Mr. Anderson's proof does not show any knowing presentation of a false or fraudulent claim. All it shows is that Northern Telecom's engineers built a switch that was not satisfactory, and after installing it, they fixed it. Regardless of whether presentation of a claim for payment for the inadequately grounded switch would have been a violation of the statute, the evidence does not show any such presentation. These are the relevant dates:

Northern Telecom installs the Letterkenny switch—March 1986

Northern Telecom fixes the ground—March 1987

Army accepts the switch—October 1987, August 1989

Northern Telecom bills Army—November 1987, August 1989

Army pays Northern Telecom—December 1987, September 1989

Basically, the switch was installed, it had bugs, the bugs were fixed, and then the vendor billed the Army and was paid. The Army and Northern Telecom discovered the problems in the switch when it was put into service in March of 1986. At that point, Northern Telecom began a year and a half of work to bring this and other switches up to a level of performance satisfactory to the Army. An October 31, 1986 Northern Telecom internal memorandum says "[t]he Letterkenny switch was cutover (in service) on March 14, 1986 with deficiencies," and "[s]ince that time, we have been endeavoring to get the issues resolved . . . such that we can accomplish the . . . acceptance test and get the Army to agree to pay us." However, it took a long time to figure out whether the hum on the line was caused by fluorescent lights, the AC power supply, dirt, installation error, some aspect of the switches, or any number of other possibilities, and to figure out what to do about it.

■ Mr. Anderson offered no evidence to prove the contrary. He used the same materials outlined above to show that when the Letterkenny switch was installed, it was not as good as it should have been. But the *qui tam* action does not lie for the ordinary failings of engineers. It requires knowing presentation of a false or fraudulent claim. Mr. Anderson submitted affidavits of two people who worked on telecommunications purchases at different military bases, not Letterkenny Army Depot. Their bases received switches different from the Letterkenny switch. One said the Air Force "usually approved Northern Telecom's proposed testing procedures." The other said "if [Anderson's] allegations are true, I believe I should have been told." This evidence does not establish a genuine issue as to whether Northern Telecom knowingly presented a false claim for the Letterkenny Army Depot switch.

There is no direct evidence, and no evidence from which a jury could reasonably draw an inference, that Northern Telecom knowingly presented a false or fraudulent claim to the Army for the Letterkenny

switch. There is evidence that, when installed, the Letterkenny switch did not work properly. But no reasonable jury could draw an inference of presentation of a false or fraudulent claim from that. The Army knew the switch was unsatisfactory, and expressed its dissatisfaction. There is no evidence in the record that Northern Telecom knowingly presented a false or fraudulent claim for the switch.

### III. Conclusion

We reverse the district court's dismissal of Mr. Anderson's claims based on his disclosure to the FBI, and remand for further proceedings under the 1986 amendment. We affirm the district court's grant of summary judgment as to the Letterkenny Army Depot switch. The parties shall bear their own costs on appeal.

AFFIRMED in part, REVERSED in part, and REMANDED.