**Ramon AZURIN; Gregorio Araneta, Plaintiffs-Appellees,**

v.

**William VON RAAB, in his capacity as Commissioner of Customs of the United States Customs Service, Defendant-Appellant.**

**No. 86–2154.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 8, 1986.

Decided Oct. 29, 1986.

---

Anderson, Hibey, Nauheim & Blair, Richard A. Hibey, Timothy M. Broas, Gordon A. Coffee, Washington, D.C., for plaintiffs-appellees.

Richard K. Willard, Asst. Atty. Gen., Daniel A. Bent, U.S. Atty., John F. Cordes, Nicholas S. Zeppos, Gregory S. U.S. Dept. of Justice, Walden, Washington, D.C., for defendant-appellant.

Republic of the Philippines, Presidential Commission on Good Government, Republic of the Philippines Severina B. Rivera, Mark D. Bernstein, Honolulu, Hawaii, for amicus curiae.

Before WALLACE, ALARCON, and BEEZER, Circuit Judges.

WALLACE, Circuit Judge:

The United States Customs Service (Customs) appeals from an order of the district court issuing a writ of mandamus requiring it to release from custody certain property imported into the country. The district court had jurisdiction pursuant to 28 U.S.C. § 1361. We have jurisdiction under 28 U.S.C. § 1291. We conclude that the writ of mandamus was improperly issued.

I

This dispute arises out of the highly publicized departure of former President Ferdinand Marcos from the Republic of the Philippines. On February 26, 1986, Ramon Azurin and Gregorio Araneta (Azurin) arrived by military transport in Hawaii as part of a group of 90 individuals traveling with Marcos. Accompanying Marcos and his entourage was a second plane loaded with currency, jewelry, and other valuables. Customs took immediate possession of this property and commenced formal entry processing. Soon after the arrival of Marcos, a dispute arose over ownership of the merchandise. On March 1, the President of the Republic of the Philippines, Corazon Aquino, sent a letter to the United States Ambassador to the Philippines, Stephen Bosworth, requesting that the United States not release the imported property until its legal ownership could be established. This request was apparently con-

veyed to Customs. Marcos, acting through Azurin, filled out all the requisite Customs declarations, agreed to pay all applicable tariffs, and requested that Customs release the property. Faced with the conflicting claims of ownership, Customs refused to do so.

On March 13, 1986, Azurin filed an action in the United States District Court for the District of Hawaii, seeking a writ of mandamus compelling Customs to release the property. Around the same time, the Republic of the Philippines sent a second letter to Ambassador Bosworth, formally claiming ownership of the disputed property. The Central Bank of the Republic of the Philippines subsequently filed two suits in the District of Hawaii seeking return of all currency and gold imported by Marcos and his party. On June 16, 1986, the Republic of the Philippines filed another action in the Central District of California seeking, among other things, return of all property brought in or allegedly owned by Marcos. In one of the actions in the District of Hawaii, Customs sought leave to file a counterclaim and cross-claim which would implead the detained property. On June 6, 1986, the district court held a hearing in the instant case and issued the writ of mandamus, ruling that "Customs has no statutory duty or right to detain goods until such time as an importer proves legal ownership of the goods." Following the issuance of an emergency stay, Customs filed a timely appeal.

## II

■ Mandamus relief is available to compel an official of the United States to perform a duty owed to an individual only if (1) the individual's claim is clear and certain; (2) the official's duty is "ministerial and so plainly prescribed as to be free from doubt"; and (3) no other adequate remedy is available. *Fallini v. Hodel,* 783 F.2d 1343, 1345 (9th Cir.1986) (*Fallini*). Whether each element of the mandamus test is satisfied is a question of law reviewable de novo. *Id.*

The critical issue in this appeal pertains to the second prong of the mandamus test. In the case before us, this prong requires that Customs have a ministerial duty to release the goods so plainly prescribed as to be free from doubt. The starting point in determining the scope of Customs's duty lies in examining the language of the agency's enabling statutes. *Board of Governors v. Dimension Financial Corp.,* ——— U.S. ———, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Customs's statutory authority to detain goods is set out in section 1490(a) of the Tariff Act of 1930 (the Act):

> Whenever entry of any imported merchandise is not made within the time provided by law or the regulations prescribed by the Secretary of the Treasury, or whenever entry of such merchandise is incomplete because of failure to pay the estimated duties, or whenever, in the opinion of the appropriate customs officer, entry of such merchandise can not be made for want of proper documents *or other cause,* or whenever the appropriate customs officer believes that any merchandise is not correctly and legally invoiced, he shall take the merchandise into his custody ... to be held ... until entry is made or completed and the proper documents are produced, or a bond given for their production.

19 U.S.C. § 1490(a) (emphasis added).

The parties' dispute centers on the phrase "or other cause." Customs argues that this phrase grants it broad discretion to detain goods for any number of reasons, including failure to prove ownership. Azurin argues that ownership is pertinent for purposes of entry only insofar as it is necessary for Customs to determine who is liable for duty. Since he has offered to pay all applicable duties, Azurin argues that ownership has been rendered irrelevant, and Customs therefore no longer has au-

thority under section 1490 or any other statute to detain the disputed property.

Both sides concede that neither this statute, nor any other Customs statute or regulation, specifies an *explicit* duty to release goods under these circumstances. Because this is an action for mandamus, we need not determine the full scope of the authority of Customs to detain goods. Instead, the focus of our inquiry is limited to determining whether Customs has a clear ministerial duty to release the detained property despite the existence of conflicting claims of ownership.

The applicable statutes do not directly address this issue. However, some assistance in interpreting the statutory scheme is provided by the statute governing the "entry of merchandise," 19 U.S.C. § 1484(a)(2)(C). That section requires all entry documentation to be filed by the "owner or purchaser" of the imported merchandise. When a consignee declares on entry that he is the owner, this same section provides that Customs "may, without liability, accept the declaration" of ownership. Customs argues that this language grants it broad discretion to inquire into ownership, and, if necessary, to detain property pursuant to section 1490 until ownership can be established. Azurin argues that section 1484(a)(2)(C) is merely a "hold harmless" provision that permits Customs to accept or reject a declaration of ownership without fear of liability so that it need not detain property until proof of ownership is produced. The applicable statutes and regulations do not define "owner or purchaser" for purposes of section 1484(a)(2)(c), nor do they explicitly state the reason for the section's "owner or purchaser" requirement.

The plain language of this section suggests that legal ownership may be relevant for purposes of entry. The statute requires entry documentation to be filed by the "owner or purchaser," *not* the "possessor" or "the individual willing to pay duties." Even more important, the statute does not create a clear ministerial duty to ignore legal ownership when determining whether to release goods.

Indeed, principles of administrative law implicated by the plain language of section 1484(a)(2)(C) suggest that Customs may well have to consider the issue of legal ownership before it can reject a declaration. Both sides concede that this section gives Customs the power to accept or reject a declaration of ownership made by a consignee. Customs, however, cannot act arbitrarily. It must have some justification for rejecting a declaration. *Cf. Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971) (informal agency decisions must be based on consideration of relevant factors). The only possible justification for rejecting a declaration of ownership under this statute is that the Customs official has some reason to believe that the declarant does not have any right to possess the goods. Thus, in order to reject such a declaration, Customs necessarily has to consider "legal ownership." Interpreting the statute in a way that rendered legal ownership irrelevant would permit Customs to act arbitrarily.

Nor can we find a duty to ignore legal title in the agency regulations governing importation of property. Azurin relies on 19 C.F.R. § 101.1(1) (1985), which defines "importer" as the individual "primarily liable for the payment of any duties on the merchandise," to support the assertion that ownership is relevant only insofar as it is necessary to determine who is liable for duty. Section 1484(a)(2)(C), however, requires that the "importer of record" for purposes of documentation be either the "owner or purchaser" or, "when appropriately designated by the owner, purchaser, or consignee," a licensed customs broker. Thus, the statute suggests that for purposes of filing documentation, the "importer of record" must be someone with a legal right to possession.

At first glance, 19 C.F.R. § 141.12 (1985), governing the importation of merchandise other than by common carrier, appears to support Azurin's position. Section 141.12

creates a presumption that "[w]hen merchandise is not imported by a common carrier, possession of the merchandise at the time of arrival in the United States shall be deemed sufficient evidence of the right to make entry." The regulation does not address the issue of conflicting claims of ownership. The immediately preceding regulation, however, entitled *"Merchandise released directly to carrier"* contains the caveat that:

> Customs responsibility under this optional entry procedure *is limited to the collection of duties,* and constitutes no representation whatsoever regarding the right of any person to obtain possession of the merchandise from the carrier.

19 C.F.R. § 141.11(b) (1985) (emphasis added). Absence of this caveat in section 141.-12, it can be argued, suggests that Customs's responsibility when entry is not made by common carrier can go beyond mere "collection of duties." But setting that argument aside, it is clear that section 141.12 only allows a possessor to "make entry." "Entry" is the act of filing the documentation required by Customs. *See* 19 C.F.R. § 141.0a(a) (1985). Plainly read, this regulation allows a possessor to file entry documentation. Nothing, however, requires Customs to accept that documentation. Section 141.12 does not create a ministerial duty to ignore legal ownership in determining whether to accept the documentation that is filed.

Therefore, our review of the applicable statutes and regulations shows that there is no explicit provision prohibiting Customs from considering or determining legal ownership for purposes other than levying duties. The district court, however, asserted that "200 years of Customs law and practice" as well as declarations made by various Customs officials that the agency would normally release the property in this situation demonstrate that Customs was required to accept Azurin's declaration of ownership. The court supported this conclusion by examining the legislative history of a repealed Customs statute, 19 U.S.C. § 1483 (1983). This section provided that property imported into the United States

was held to be the property of the consignee, who in turn evidenced his rights to possession by holding a bill of lading.

■ Although we appreciate the strength of the position taken by the district court, we conclude it falls short of what is required in this case. To warrant the issuance of mandamus, the official's duty must be "ministerial and so plainly prescribed as to be free from doubt." *Fallini,* 783 F.2d at 1345. Absent an explicit statutory or regulatory mandate, past agency behavior does not necessarily bind the agency to the same procedures, especially when it is faced with an extraordinary and unique situation. Thus, even if Customs may not have considered legal ownership in this type of situation in the past, it does not necessarily follow that a ministerial duty was created never to consider legal ownership. *Cf. United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 755, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972) (agency's authority to use rules of general application entails concomitant authority to make exceptions to allow for special circumstances); *Leonhard v. Mitchell,* 473 F.2d 709, 713 (2d Cir.) (writ of mandamus is only appropriate when a government official fails to comply with an explicit statutory, regulatory or constitutional mandate), *cert. denied,* 412 U.S. 949, 93 S.Ct. 3011, 37 L.Ed.2d 1102 (1973).

Nor do we agree with the district court that this case may be decided on the basis that Customs "has conceded the duty to release the merchandise upon payment of duties and determination that the merchandise may enter the country lawfully." We do not find any concession by Customs that ownership is irrelevant in determining whether merchandise "may enter the country lawfully." The Regional Commissioner of Customs in charge of the Hawaiian district, William Logan, stated in the district court proceedings that under normal circumstances Customs would release property once duties were paid and all documentation was filed. It does not necessarily follow that this was a normal circumstance.

Moreover, the district court stated that the affidavit of George Roberts, the District Director of Customs who was directly responsible for processing the disputed property, suggested that Roberts "routinely requires documentation verifying ownership of personal effects." Although the district judge may reject this testimony, the testimony does at least demonstrate that Customs did not concede the issue. Indeed, there are no statements by any Customs officials in the record indicating that Customs has a *ministerial* duty to release merchandise where ownership is in dispute.

Nor are we persuaded by the district court's reliance on section 1483. Section 1483 was repealed in 1982, *see* Pub.L. No. 97–446, § 201(c), 96 Stat. 2349 (1982), and therefore has no direct bearing on this case. Even when in effect, section 1483 arguably did not render legal ownership irrelevant. *See, e.g., United States v. William H. Masson, Inc.*, 33 F.Supp. 874, 876 (D.Md.1940) ("[t]he one having legal title to, that is, the true holder of ... a bill of lading, is the only one entitled to receive the goods").

### III

Azurin's additional arguments fare no better. Azurin argues that the district court's decision is supported by *Fonseca v. Regan*, 734 F.2d 944 (2d Cir.) (*Fonseca*), *cert. denied*, 469 U.S. 882, 105 S.Ct. 249, 83 L.Ed.2d 186 (1984), and *Dunbar v. United States*, 502 F.2d 506 (5th Cir.1974) (*Dunbar*). In the first case, Fonseca sought return of a suitcase containing $250,000 in currency that had accidently been misdirected to New York City from its original destination of Lima, Peru. The Customs officials refused to return the bag, suspecting that Fonseca had violated Columbian currency control laws. Fonseca, Columbia, and the State of New York subsequently filed claims to the money.

Fonseca never intended to enter the lost baggage into the United States. The case was decided on the common law ground that "the holder of a baggage claim check is ordinarily entitled to the return of

checked baggage." *Fonseca*, 734 F.2d at 949. The decision was not based on the application of Customs statutes and regulations. Moreover, the court stated that conflicting claims of ownership of the property asserted by the State of New York, the Columbian government, and the United States were not "colorable" or were "suspect." *Id.* at 950. There is no indication in the record that the claim of the Republic of the Philippines is not colorable.

*Dunbar* is even less germane. There, the court ordered the Federal Bureau of Investigation and the Internal Revenue Service to return $21,500 that Dunbar had mailed but that had not reached the addressee. The court's decision was based on Post Office regulations substantially different from the statutes and regulations implicated in this case. Furthermore, the property in *Dunbar* was not subject to conflicting claims of ownership, but instead was being held pending the resolution of an FBI investigation. *Dunbar*, 502 F.2d at 507–08. Thus, neither side has cited, nor have we found, any decision suggesting that Customs has a ministerial duty to ignore legal ownership in the execution of its duties.

Azurin also argues that Customs detention of the property is improper because interpleader is inappropriate. The interpleader action is still pending before the Hawaiian district court. This issue is not ripe for appellate review.

Azurin argues that because Marcos was designated a "distinguished foreign visitor" for purposes of Secret Service protection, Customs regulations require it to admit the baggage and effects of the Marcos party "free of duty and without having to file an entry." 19 C.F.R. § 148.82(b)(4) (1985). Under this regulation, special treatment is accorded to individuals who are designated "distinguished foreign visitors" by the Department of State. The Department of State never designated Marcos a "distinguished foreign visitor." The regulation is inapplicable.

Finally, both sides present spirited arguments that important foreign policy consid-

erations justify disposition of the suit in their favor. Because of the narrowness of our focus, we need not reach this issue.

## IV

In conclusion, we emphasize the narrowness of our holding. We do not reach the question of whether the first and third prongs of the mandamus test were met. Nor do we reach the issue of whether Customs has discretion to inject foreign policy considerations into the execution of its statutory duties. We consider only the narrow statutory question of whether Customs has a clear ministerial duty to ignore disputes over legal ownership in determining whether to release goods from detention. There is no explicit statute or regulation requiring Customs to return the property in this situation. While Customs may normally release goods without considering legal ownership beyond what is necessary to levy duties, there is no statute or regulation specifically prohibiting it from doing so. Customs's duty to release imported property when faced with facially valid conflicting claims of ownership is not "ministerial and so plainly prescribed as to be free from doubt."

REVERSED.