**CHEVRON, U.S.A. PRODUCTION CO. (a division of Chevron, U.S.A., Inc.), Plaintiff,**

v.

**Hazel O'LEARY, as Secretary, United States Department of Energy, and United States Department of Energy, Defendants.**

**No. CV–F–96–6345 OWW SMS.**

United States District Court, E.D. California.

Feb. 27, 1997.

Stephen D. Alexander, Fried, Frank, Harris, Shriver and Jacobson, Los Angeles, CA, for plaintiff.

Thomas W. Millet, United States Department of Justice, Washington, DC, for defendants.

## MEMORANDUM OPINION AND ORDER RE: PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION; CROSS–MOTIONS FOR SUMMARY JUDGMENT

WANGER, District Judge.

## I. INTRODUCTION

On December 12, 1996, Plaintiff Chevron, U.S.A. Production Co. ("Chevron") filed a complaint against the government[1] to compel agency action. On December 19, Chevron filed a motion for a preliminary injunction, which it sought to have heard on shortened time. *See* Pl.'s Ex Parte Application for Order Shortening Time. Chevron and the government now stipulate that the following motions will be argued together:

1) Chevron's motion for a preliminary injunction;

2) Chevron's motion for summary judgment, which was filed on January 7, 1997; and

---

1. "The government" is Hazel O'Leary, who is Secretary of the Department of Energy ("Secretary"), and the Department of Energy ("DOE").

3) the government's cross-motion for summary judgment, which was filed on January 22, 1997.[2]

## II. BACKGROUND [3]

### A. UNIT PLAN CONTRACT

In 1944, the United States Navy and Standard Oil Company entered into a unit plan contract ("Contract") that governs the production of oil and gas at Naval Petroleum Reserve Number 1 ("NPR-1"), also known as the Elk Hills Unit. NPR-1 is located in Kern County, California. Chevron acquired Standard's interest in NPR-1; DOE acquired the Navy's interest in NPR-1. Both DOE and Chevron own various parcels of land within NPR-1.

The Contract requires that DOE and Chevron allocate oil from NPR-1 based on each party's "participation percentage." The participation percentage is based on the acre-feet of oil and gas underlying each party's respective lands in the "known commercially productive zones" of NPR-1. There are four such zones: Dry Gas, Stevens, Carneros, and Shallow Oil. If either party believes the participation percentages should be revised, it can demand such a revision. The "Engineering Committee," comprised of DOE and Chevron representatives, reviews relevant data, and if certain conditions specified in the Contract are satisfied, recommends revised participation percentages.

If the members of the Engineering Committee are unanimous in their participation percentages recommendation, then the revised participation percentages take effect. The Contract requires that any revisions be applied retroactively to past production since 1942. If the members of the Engineering Committee are not unanimous, then the Secretary[4] must determine the appropriate revision, if any, to make. If Chevron desires, it

can request the Secretary to select an Independent Petroleum Engineer ("IPE") to give her an advisory report. After the IPE prepares the advisory report and provides copies to Chevron and DOE, the Secretary must then make a final determination.

### B. SHALLOW OIL ZONE DISPUTE

DOE and Chevron have been involved in an ongoing dispute regarding participation percentages in the Shallow Oil Zone ("SOZ") for many years. Pursuant to the Contract, the dispute was referred to the Engineering Committee. In December 1994, the Engineering Committee notified DOE and Chevron that: 1) it agreed the participation percentages for the SOZ should be revised; 2) the Committee could not unanimously agree to the proper revision; and 3) the matter was referred to the Assistant Secretary for Fossil Energy, Patricia Fry Godley. Chevron requested that Godley appoint an IPE, and Godley did so.

In June 1995, DOE and Chevron submitted evidence and argument to the IPE. DOE proposed that its participation percentage be 75.4723%, leaving 24.5277% for Chevron; Chevron proposed that DOE's participation percentage be 64.9381%, leaving 35.0619% for Chevron. The current participation percentages of DOE and Chevron are 70.0119% and 29.9881%, respectively.[5] On November 21, 1995, the IPE presented his advisory report to the Assistant Secretary, in which the IPE recommended that DOE receive a participation percentage of 65.7786%, leaving 34.2214% for Chevron. To this date, Godley has not issued a final determination regarding SOZ participation percentages.

### C. NATIONAL DEFENSE AUTHORIZATION ACT OF 1996

In early 1996, Congress passed the National Defense Authorization Act for Fiscal Year

---

2. Chevron's ex parte application for an order shortening time for a hearing on its preliminary injunction motion and for the government's response is MOOT.

3. Both parties have submitted Statements of Undisputed Facts as required by Local Rule 260. The objections both parties have to these undisputed facts are primarily legal in nature. Actual factual disputes will be noted.

4. The Secretary has delegated her authority in this area to the Assistant Secretary of Fossil Energy. Godley Decl., ¶ 6.

5. Two past revisions of the participation percentages occurred: one in 1949 and one in 1957. Both of these were unanimously approved by the Engineering Committee.

1996 ("Act"), Pub.L. No. 104–106, 110 Stat. 631. Among other things, the Act requires that the government sell its interest in NPR–1 no later than 2 years after the "effective date."[6] § 3412(a). The Act also states if there is "an ongoing equity redetermination dispute" between Chevron and DOE, then the dispute shall be resolved in accordance with the Contract within eight months of the effective date. § 3412(b)(3).[7] If the Assistant Secretary concludes the actions necessary to complete the sale are not being taken or timely completed, then the Assistant Secretary shall notify Congress in writing of her conclusion "together with a plan setting forth the actions that will be taken to ensure that the sale of [NPR–1] will be completed within [two years after the effective date]." § 3412(i).

## D. LETTERS TO CONGRESS

On July 18, 1996, Godley sent letters to the chairpersons and ranking minority leaders of the Senate Armed Services Committee, House National Security Committee, and the House Commerce Committee, explaining intermediate deadlines embodied in the Act will not be met and submitting a new schedule of deadlines, pursuant to § 3412(i). This schedule provides a May 1997 deadline for "Finalizing All Equity Interests." The parties sharply dispute whether: 1) the SOZ participation percentage dispute is included as an "Equity Interest" under the schedule; and 2) whether Godley has the power to extend any interim deadline.

## E. SUBSEQUENT EVENTS

In September 1996, Chevron met with DOE to discuss the SOZ participation percentage dispute. Godley informed Chevron she would render her preliminary determination by October 15, 1996; give Chevron 60 days (plus an additional 30 days at Chevron's request) to submit comments on the determination, which would be January 13, 1997, at the latest; and issue a final determination 45 days thereafter, which would be February 27, 1997. The government contends Chevron did not protest the plan at the time.

Godley did not issue a preliminary determination on October 15. Chevron claims during October and November 1996, Godley promised several times to issue the preliminary determination but failed to do so; the government claims these were merely Godley's "best estimates" and that she made no firm commitments about when she would issue a preliminary determination. Chevron and DOE met again on November 25. At that meeting, Chevron demanded to know when the preliminary determination would be issued. Godley informed Chevron that she planned to get additional technical advice regarding the SOZ participation percentage dispute from an outside petroleum engineering firm, Ryder Scott Company.

The government claims Ryder Scott's analysis should be complete by mid-March 1997. It also claims Godley will be able to issue a preliminary determination by April 1997.

## III. STANDARD

### A. SUMMARY JUDGMENT

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *see Maffei v. Northern Ins. Co. of New York*, 12 F.3d 892, 899 (9th Cir.1993). A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir.1995); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252–56, 106 S.Ct. 2505, 2512–14, 91 L.Ed.2d 202 (1986). The non-moving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. *U.A. Local 343 v. Nor–Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir.), *cert. de-*

---

**6.** Both sides agree the "effective date" is February 10, 1996, the enactment date of the act. *See* § 3411(4).

**7.** The procedure under the Contract is summarized *supra* on page 1490, lines 7–17.

*nied,* —— U.S. ——, 116 S.Ct. 297, 133 L.Ed.2d 203 (1995).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ The more implausible the claim or defense asserted by the opposing party, the more persuasive its evidence must be to avoid summary judgment. *United States ex rel. Anderson v. Northern Telecom, Inc.,* 52 F.3d 810, 815 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 700, 133 L.Ed.2d 657 (1996). Nevertheless, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor." *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513. A court's role on summary judgment, however, is not to weigh the evidence, *i.e.,* issue resolution, but rather to find genuine factual issues. *Abdul–Jabbar v. General Motors Corp.,* 85 F.3d 407, 410 (9th Cir.1996).

■ Evidence submitted in support of or in opposition to a motion for summary judgment must be admissible under the standard articulated in 56(e). *See Keenan v. Hall,* 83 F.3d 1083, 1090 n. 1 (9th Cir.1996); *Anheuser–Busch, Inc. v. Nat'l Beverage Distribs.,* 69 F.3d 337, 345 n. 4 (9th Cir.1995). Properly authenticated documents, including discovery documents, although such documents are not admissible in that form at trial, can be used in a motion for summary judgment if appropriately authenticated by affidavit or declaration. *United States v. One Parcel of Real Property,* 904 F.2d 487, 491–492 (9th Cir.1990). Supporting and opposing affidavits must be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Fed.R.Civ.P. 56(e); *Conner v. Sakai,* 15 F.3d 1463, 1470 (9th Cir.1993), *rev'd on other grounds sub nom. Sandin v. Conner,* —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

## B. PRELIMINARY INJUNCTION

■ The traditional test for preliminary injunctions requires that the plaintiff establish:

(1) a strong likelihood of success on the merits;

(2) the possibility of irreparable injury to the plaintiff if the injunction is denied;

(3) that the balance of hardships favors the plaintiff; and

(4) the public interest favors granting the injunction.

*Alaska v. Native Village of Venetie,* 856 F.2d 1384, 1388 (9th Cir.1988). In recent years, the Ninth Circuit has used a test which condenses the latter three factors into a single element, which weighs the relative balance of hardships to the plaintiff, defendant, and the public. Under this reformulated test, an injunction will issue if the plaintiff can show either (1) a probable success on the merits and a possibility of irreparable injury, or (2) a fair chance of success on the merits, and the balance of hardships tipping sharply in plaintiff's favor. *American–Arab Anti–Discrimination Committee v. Reno,* 70 F.3d 1045, 1062 (9th Cir.1995). The two alternatives in the above test should not be treated as separate, independent inquiries, but rather as opposite ends of a continuum in which the necessity for showing "irreparable" harm increases as the probability of success on the merits decreases." *Associated General Contractors of California, Inc. v. Coalition for Economic Equity,* 950 F.2d 1401, 1410 (9th Cir.1991), *cert. denied,* 503 U.S. 985, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992).

## IV. DISCUSSION

### A. SUMMARY JUDGMENT

#### 1. Summary of Parties' Claims

Chevron argues it is entitled to a court order requiring the Secretary to resolve the

SOZ participation percentage dispute, as allegedly required by § 3412(b)(3) of the Act. It argues that Godley's letters to Congress, sent pursuant to § 3412(i), did not affect her duty under § 3412(b)(3) to resolve this dispute for many reasons: 1) § 3412(i) is a notification provision that does not confer substantive authority to the Secretary to alter statutory deadlines; 2) the letters did not purport to extend the deadline for the SOZ participation percentage dispute; and 3) even if the Secretary validly extended the § 3412(b)(1) deadline for finalizing equity interests, that does not affect the § 3412(b)(3) deadline for resolving the SOZ participation percentage dispute.

The government argues § 3412(i) authorizes the Secretary to extend the deadline for finalizing equity interests at NPR–1, including the SOZ dispute. The schedule sent to Congress provides a May 1997 deadline to "Finalize *All* Equity Interests." Godley Decl., Ex. J (emphasis added). The government claims "All" includes the SOZ dispute, and that when Godley sent the schedule to Congress, she meant to extend the deadline for resolving the SOZ participation percentage dispute. Finally, the government argues that even if the deadline for resolving the SOZ dispute was not extended by the schedules sent to Congress and § 3412(i), Chevron is not entitled to affirmative injunctive relief because the delay it has endured is slight and the harm it has suffered is small.

### 2. Standard Governing Relief

■ Chevron seeks relief under § 706(1) of the Administrative Procedure Act ("APA"), the mandamus statute (28 U.S.C. § 1361), and the declaratory relief statute (28 U.S.C. § 2201(a)). The government argues that the type of relief Chevron seeks (a court order forcing the Secretary to resolve the SOZ participation percentage dispute) is in the nature of mandamus and must be governed by the rigorous mandamus standard. Chevron argues that relief under APA § 706(1) is not mandamus and is a statutory remedy to compel agency action unreasonably delayed or unlawfully withheld.

In a recent case, the Ninth Circuit held that when APA § 706(1) and the mandamus statute are cited as bases to have a court order government employees to perform ministerial duties, the claim should be analyzed under APA standards, not under mandamus standards. *Independence Mining Co., Inc. v. Babbitt,* 105 F.3d 502, 507 n. 6 (9th Cir.1997) ("We question the applicability of the traditional mandamus remedy ... where there is an adequate remedy under the APA."). Chevron's declaratory relief claim seeks the same relief as Chevron's mandamus and APA claims. It will also be evaluated under APA standards.

■ Section 706(1) of the APA permits a court to compel "agency action unlawfully withheld or unreasonably delayed." Chevron argues that the Secretary's inaction in resolving the SOZ dispute is unlawful and is "agency action unreasonably delayed." To evaluate whether relief under the APA is appropriate, the multi-factor test set out in *Telecommunications Research & Action v. FCC,* 750 F.2d 70, 79–80 (D.C.Cir.1984) ("*TRAC*"), is used. *Independence Mining Co.,* 105 F.3d at 506–07. A court has discretion whether to order affirmative relief, even if the *TRAC* factors are satisfied. *See Independence Mining Co.,* 105 F.3d at 506–07 (relief under APA § 706(1) is essentially the same as mandamus relief); *Oregon Nat'l Resources Council v. Harrell,* 52 F.3d 1499, 1508 (9th Cir.1995) (even if all elements of mandamus test are satisfied, court may still decline to grant mandamus relief).

Chevron argues that when the government misses an express statutory deadline, a clear case of relief is presented under APA § 706(1). Pls.' Prelim.Inj.P. & A. 15 (citing *Public Citizen Health Research Group v. Comm'r,* 740 F.2d 21, 32 (D.C.Cir.1984)). The government responds that statutory deadline cases relied upon by Chevron are distinguishable because here, the deadline can be extended by the Secretary. *See* Gov't Reply 4 (citing § 3412(i), § 3414).

### 3. *TRAC* Test
#### a. Congressional Intent

Chevron argues the statutory scheme is clear that the Secretary (through her designate, the Assistant Secretary) was required

to resolve the SOZ dispute by October 10, 1996, but did not do so. It refers to 33 U.S.C. § 1311(c), which expressly permits the EPA Administrator to unilaterally extend various Clean Water Act statutory deadlines, as an example of Congress' knowledge of how to properly give administrative agencies, such as DOE, unilateral authority to modify statutory deadlines. Chevron argues the failure of § 3412(i) to expressly provide the Secretary with authority to modify deadlines shows Congress did not intend to give such power to the Secretary. The government argues the statutory scheme is equally clear that the Secretary has power to extend all interim deadlines, including the October 10, 1996 deadline, under § 3412(i).

Both sides agree that § 3412(b)(3) of the Act requires the Secretary to resolve any "ongoing equity determination dispute[s]" by October 10, 1996. Both sides agree the SOZ participation percentage dispute is an "ongoing equity determination dispute" that has yet to be resolved. The real question is whether Godley's transmission of letters and revised schedules to Congress extended the October 10, 1996 deadline pursuant to § 3412(i), as the government argues. The government contends: 1) § 3412(i) gives power to the Secretary to extend interim deadlines, including the § 3412(b)(3) deadline applicable to this dispute; and 2) the Secretary (through Assistant Secretary Godley) exercised this power for the SOZ dispute when Godley sent her letters and revised schedules to Congress.

### Power to Extend Deadlines

Section 3412(i) reads:

(i) NONCOMPLIANCE WITH DEADLINES.—At any time during the two-year period beginning on the effective date [February 10, 1996], if the Secretary determines that the actions necessary to complete the sale of the reserve within that period are not being taken or timely completed, the Secretary shall transmit to the appropriate congressional committees a written notification of that determination together with a plan setting forth the actions that will be taken to ensure the sale of [the government's interest in NPR-1] will be complet-

ed within that period. The Secretary shall consult with the Director of the Office of Management and Budget ["OMB Director"] in preparing the plan for submission to the committees.

Chevron argues this is a notification provision, only designed to inform Congress that interim deadlines cannot be met. It argues § 3412(i) conveys no power at all to the Secretary to change deadlines. The government argues the phrase "actions that will be taken" shows the Secretary has power to modify interim deadlines to ensure that the ultimate deadline of February 10, 1998 will be met. The government argues that since Congress gave the greater power to the Secretary to suspend the sale of NPR-1 if the sales price is too low or for other reasons, *see* § 3414(b), it follows that Congress granted the lesser power to the Secretary to adjust interim deadlines.

■ When the plain meaning of a statute is clear, a court must accept that construction, even if the administering agency has a contrary construction of the statute. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). If the statute is ambiguous, then the administering agency's construction *must be accepted if it is reasonable. Queen of Angels/Hollywood Presbyterian Medical Center v. Shalala*, 65 F.3d 1472, 1477 (9th Cir.1995) (emphasis added). The administering agency's construction need not be the most reasonable or persuasive as long as it is a permissible construction. *Id.*

■ The plain meaning of a statute is determined by examining the words of the statute in the context of surrounding statutory provisions and the purposes behind the statute. *United States v. Lewis*, 67 F.3d 225, 228–29 (9th Cir.1995). Here, the phrase "plan setting forth actions that will be taken" is ambiguous. A "plan" connotes a prescribed course of future conduct. The statutory authority to formulate a plan could logically include the ability to authorize action to extend interim deadlines to ensure the sale of the government's interests in NPR-1 by February 10, 1998, which is the overall two-

year deadline. This interpretation of "plan" advances the primary goal of the Act, which is to facilitate the most advantageous terms and conditions for sale of the government's interests in NPR–1.

The purpose behind establishing interim deadlines, such as those in § 3412(b), is not specifically identified in the Act. Equity finalization deadlines enable the government to know exactly the nature and extent of the interests it is selling in advance of the final sale date, which will permit DOE to obtain the best sale terms.

■ On the other hand, a "plan" may merely provide for the extension of statutory deadlines without implementing the extensions. Section 3414 specifically grants the Secretary the power to suspend the overall sale: "The Secretary may suspend the sale of [NPR–1]. . . ." Section 3412(i) contains no such language. "Congress is presumed to act intentionally and purposely when it includes language in one section but omits it in another." *Oregon Nat'l Resources Council v. Kantor,* 99 F.3d 334, 339 (9th Cir.1996) (citations omitted). Chevron argues the phrase "plan setting forth the actions that will be taken" grants the Secretary no power to alter statutory deadlines. Rather, it only authorizes the Secretary to send Congress a proposed interim deadline timetable. In Chevron's view, only Congress can actually change the deadlines set forth in § 3412; the interim deadlines are immutable without legislative action.

■ Both constructions are plausible. Section 3412(i) is ambiguous. Deference must be given to the administering agency's construction. *See Queen of Angels,* 65 F.3d at 1477. "It is sometimes helpful to examine legislative history to ensure that the result we reach by our interpretation of the language of the statute is not wholly contrary to the statutory purpose." *In re Rufener Const. Inc.,* 53 F.3d 1064, 1067 (9th Cir.1995). Here, the legislative history of the Act supports the government's construction: "The conferees believe *the Secretary should suspend the sale* only after *all efforts have been made* to ameliorate any difficulties in the sale of the reserve [NPR–1]." H.R.Conf.Rep. 104–106, 104th Cong., 1st Sess. 974 (1995)

(emphasis added). This implies the Secretary has the power to address problems that arise during the sale process by extending interim deadlines, as part of taking "all efforts to ameliorate any difficulties in the sale of the reserve."

A reasonable interpretation of the Secretary's power under the Act is that she possesses the lesser authority to extend interim deadlines under § 3412(i) to facilitate her exercise of her ultimate authority to suspend the sale altogether under § 3414(b). Were it otherwise, if the Secretary ran into problems in finalizing equity interests (as she claims has occurred due to the drain on DOE's personnel resources in working on the overall NPR–1 sale), she is nonetheless required to either: 1) sell unfinalized equity interests by the two-year deadline, which would be contrary to the purpose behind § 3412(b); or 2) suspend the sale altogether under § 3414 and defeat Congress' intent to sell the government's interests in NPR–1 within two years, even though by extending interim deadlines, the overall two-year deadline could have been met.

■ Under Chevron's view, the only way for the Secretary to address a minor problem in the valuation process for NPR–1 is to suspend the sale under § 3414. If § 3414 is invoked by the Secretary (along with the OMB Director), then the sale cannot be consummated until Congress affirmatively reauthorizes the sale through legislative action. § 3414(c). Chevron's construction of the Act leaves the Secretary powerless to resolve minor problems without upsetting the entire sale and requiring new legislation authorizing the sale, which unnecessarily ties the Secretary's hands. The legislative history indicates that suspension of the sale should be a last resort, not the only remedy available to the Secretary to address minor problems in the valuation process and sale. Although courts should not reinterpret clear statutory provisions to reflect their own policy preferences, *see TVA v. Hill,* 437 U.S. 153, 194–95, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978), policy concerns are relevant when determining the meaning of ambiguous statutory provisions. *See Rose v. Lundy,* 455 U.S. 509,

516–17, 102 S.Ct. 1198, 1202–03, 71 L.Ed.2d 379 (1982). Chevron's construction of the Act imposes unnecessary burdens of legislative action and delay while preventing the Secretary from doing all that is needed in finalizing, evaluating, and preparing for sale the government's interest in NPR–1.

The Secretary's construction of § 3412(i) is neither unlawful nor unreasonable. Under § 3412(i), the Secretary has the power to modify interim deadlines by submitting her plan to Congress.

### *Was the § 3412(b)(3) Deadline Actually Extended?*

■ Chevron argues even if the Secretary has power to extend interim deadlines, she did not extend the § 3412(b)(3) deadline for three reasons: 1) the letters sent to Congress do not mention the SOZ dispute; 2) the phrase "Finalize All Equity Interests", contained in the schedules sent to Congress, does not refer to the SOZ dispute, which is a pending "equity redetermination dispute"; and 3) extending the equity interest finalization deadline, as the schedules purport to do, at most affects § 3412(b)(1) only, not § 3412(b)(3).

The government responds that the schedules sent to Congress, not the letters, have legal significance. It argues the phrase "Finalize All Equity Interests" in the schedules sent to Congress encompasses the SOZ dispute, which concerns an "equity interest." It further argues the same timetable applies to all four zones, even if a different dispute resolution process is used for the SOZ than for finalization of its interests in the other zones.

Godley's letters discuss that the Investment Banker who is the "Sales Administrator," the IPE firm that is developing the Reserve Report, and the IPE firm retained for equity finalization have told Godley that many of the interim deadlines need to be changed. Contrary to Chevron's assertions, it is not dispositive that the IPE firm referred to here is not the IPE firm that finished making SOZ dispute recommenda-

tions in November 1995. The IPE firm working on the Reserve Report is doing so for all four zones. The Investment Banker is also working on the sale of all four zones. The letter does not explicitly or implicitly exclude the SOZ from its purview.

Chevron emphasizes the timing of the letters. They were sent shortly after Chevron and DOE agreed on the Protocol, an agreement that implemented a process for the finalization of equity interests in the Dry Gas, Carneros, and Stevens Zones—not the SOZ. Second Block Decl., Ex. B. Chevron argues the Protocol, which expressly excluded the SOZ, was the only reason the letters were sent. Even if the Protocol prompted the sending of the letters and schedules, that does not mean the letters and schedules were limited to matters discussed in the Protocol. Indeed, the Protocol is not even mentioned in the letters or schedules.

The schedules extend many of the deadlines,[8] including the deadline to "Finalize All Equity Interests." The SOZ participation percentage dispute is a dispute over equity interests in the SOZ. The term "All Equity Interests" encompasses the SOZ dispute because the SOZ dispute is about the parties' "equity interests" in the SOZ. Chevron argues the SOZ dispute involves "contractual redetermination" under § 3412(b)(3), while the other three zones involve "statutory finalization" under § 3412(b)(1) and (b)(2). It argues at most, the Secretary extended the deadline for the other three zones, not for the SOZ. This interpretation is belied by the text and structure of § 3412(b):

> (b) EQUITY FINALIZATION.—(1) Not later than eight months after the effective date [October 10, 1996], the Secretary shall finalize equity interests of the known oil and gas zones in [NPR–1] in the manner provided by this subsection.

> (2) The Secretary shall retain the services of an independent petroleum engineer [IPE], mutually acceptable to the equity owners, who shall prepare a recommendation on final equity figures. The Secretary

---

**8.** As discussed *supra*, § 3412(i) gives the Secretary to modify interim deadlines in all areas of the Act.

shall accept the recommendation of the [IPE] for final equity in each known oil and gas zone in [NPR-1] in accordance with the recommendation, or the Secretary may use such other method to establish final equity interest in the reserve as the Secretary considers appropriate.

(3) If, on [February 10, 1996], there is an ongoing redetermination dispute between the equity owners under section 9(b) of the unit plan contract, the dispute shall be resolved in the manner provided in the unit plan contract within eight months after the effective date [October 10, 1996]. The resolution shall be considered final for all purposes under this section.

The subheading "Equity Finalization" applies to all three subsections, which implies that equity redetermination under (b)(3) is a type of "equity finalization." *See Oregon Public Utility Comm'n v. I.C.C.*, 979 F.2d 778, 780 (9th Cir.1992) (title or heading of statute can be used to resolve ambiguity). The placement of (b)(3) under the heading "Equity Finalization" has significance. *See, e.g., Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 177–78, 113 S.Ct. 2549, 2562, 125 L.Ed.2d 128 (1993) (location of a statutory provision in a particular congressional act is relevant in determining the meaning of a provision); *Pennhurst State Sch. & Hospital v. Halderman*, 451 U.S. 1, 19 n. 14, 101 S.Ct. 1531, 1541 n. 14, 67 L.Ed.2d 694 (1981) (same). The SOZ dispute is about resolving participation percentages in the SOZ; participation percentages are equity interests. It is logical to construe Godley's reference in the schedule to "Finaliz[ing] All Equity Interests" to include all equity interests, including those subject to ongoing equity redetermination disputes (such as the SOZ dispute) under (b)(3).

There is no indication that Congress wanted different deadlines for different zones. The equity determination process in all zones, including the SOZ, was to be completed by October 10, 1996. The only difference among the zones is that the SOZ was subject to an "ongoing equity redetermination dispute." In (b)(3), Congress commanded that the equity determination process be slightly different procedurally for the SOZ, but main-

tained the same eight-month equity interest finalization deadline as for the other zones. No purpose can be ascribed to (b)(3), except that it prescribes the dispute resolution process provided by § 9(b) of the Contract to resolve ongoing equity redetermination disputes. Had there been no ongoing equity redetermination dispute, as is true for the Dry Gas, Carneros, and Stevens Zones, the procedure of (b)(2) would have applied to finalize equity participation percentages within the same eight-month period.

The "eight month" language was necessarily repeated in (b)(3) to prevent any assertion that because the Contract itself has no timetable or deadlines for disputes, there was no deadline for resolution of the SOZ dispute or any other pending equity redetermination dispute. The same timetable was adopted for all zones. No "separate deadline" was intended.

### Actions of Assistant Secretary Godley

██ Chevron's last argument is that the conduct of Assistant Secretary Godley indicated that until this litigation started, she thought the deadline was October 10, 1996, not May 10, 1997. It argues that Godley promised to issue her decision many times during October and November 1996, which shows that she knew the deadline was October 10, 1996. Chevron claims that if Godley had actually changed the deadline for the SOZ dispute to May 10, 1997, she would have said so at one of her many opportunities: in her September 13, 1996 letter to Chevron; in her meetings with Carnie Block, the Vice President and General Manager for Chevron's Western Business Unit, in October and November 1996; and when Block threatened legal action. Second Block Decl. ¶¶ 14–16.

██ In effect, Chevron claims Godley's conduct either is: 1) an adoptive admission against interest, which aids in interpreting § 3412 adversely to the government's position; and/or 2) conduct giving rise to estoppel. Godley's conduct (or lack of conduct) is not dispositive. For its part, Chevron never raised any questions about the SOZ deadline. For example, Godley's letter of September 13, 1996 to Chevron laid out her planned timeline for reaching a decision:

issue a preliminary decision by October 15, 1996; allow Chevron 60–90 days for comment; and issue a final decision 45 days later. The schedule carried well beyond the October 10, 1996 deadline, yet Chevron never complained.[9] Neither side insisted on strict compliance with the deadline. The conduct of the parties sheds no light on the meaning of § 3412(i).

When Assistant Secretary Godley extended the deadline to "Finalize All Equity Interests" under § 3412(i), that phrase included the SOZ dispute under (b)(3). The deadline for resolving any equity interest dispute for the SOZ and NPR–1 as a whole is now May 10, 1997. Chevron is not entitled as a matter of law to an earlier resolution of the SOZ dispute. Congressional intent has not been abrogated by the Secretary's actions.

### b. Nature of the Interests Prejudiced by Delay

Chevron argues it is losing substantial amounts of money by the Secretary's inaction. It asserts by not having a determination on October 10, 1996, it has lost the time value of money (i.e., interest) for seven months. It estimates that if the Secretary follows the IPE's recommendation on the SOZ participation percentages, Chevron will gain roughly $240 million worth of oil. As the government points out, there is no certainty the Secretary will follow the IPE's recommendation. If the Secretary chooses DOE's desired revision, Chevron would have to "pay" the government 16.4 million barrels of oil in past production and 25,000 barrels/month in future production. Chevron argues if the Secretary intended to choose DOE's revision, she would have done so by now. That argument misperceives the government's stated reasons behind the delay: to gain more technical and scientific information about the SOZ. Chevron's alleged harm is speculative.

In addition, Chevron points to no evidence that shows its financial livelihood is being threatened or that the public welfare is at risk without mandamus relief. *See Independence Mining Co.*, 105 F.3d at 509–10. This factor weighs for the government.

### c. Other Agency Activities

Godley testifies in her declaration that one reason why the SOZ dispute has not been resolved is that everyone in her department is busy working on various aspects of the Act. *See* Godley Decl., ¶¶ 15–16. The Act requires all five Naval Reserves to be readied for potential sale. NPR–1, which will be sold first, requires many activities before it is ready for sale (resolution of equity interests, appraisal, etc.). *Id.*, ¶ 15. The SOZ dispute is only one of many equity finalizations that must be made before the government's interest can be sold.

■■■ If an agency has other legitimate priorities that compete with the duty in question, a court may take that in account in deciding whether to grant mandamus relief. *TRAC*, 750 F.2d at 80; *see Action on Smoking & Health v. Department of Labor*, 100 F.3d 991, 994 (D.C.Cir.1996). Here, Chevron has not shown that these competing priorities are non-existent or are minor. This factor weighs for the government.

### d. Bad Faith by DOE

■■■ Bad faith by an agency is unnecessary to find agency action unreasonably delayed. *Independence Mining Co.*, 105 F.3d at 510. If bad faith is present, however, then a court "should conclude that the delay is unreasonable." *Id.* (quoting *Cutler v. Hayes*, 818 F.2d 879, 898 (D.C.Cir.1987)). An agency can manifest bad faith by "singling someone out for bad treatment or [by] asserting utter indifference to a congressional deadline." *In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C.Cir.), *cert. denied*, 502 U.S.

---

**9.** Chevron argues Assistant Secretary Godley's declaration that she thought her actions were consistent with a May 10, 1997 deadline, *see* Godley Decl. ¶ 20, is a post-hoc rationalization entitled to no weight. The "post-hoc rationalization" doctrine was developed "in the context of a court's duty to set aside a 'final agency decision' if based on a post hoc rationalization." *Indepen-*

*dence Mining Co.*, 105 F.3d at 511. When a court reviews an agency's actions under APA § 706(1) for alleged delay, there has been no final agency decision, and this doctrine does not apply. *See id.* Here, Assistant Secretary Godley has made no final decision. The doctrine does not apply. Her declaration is entitled to some weight. *See id.*

906, 112 S.Ct. 297, 298, 116 L.Ed.2d 241 (1991).

■ Chevron does not argue it has been singled out for intentionally bad treatment. Rather, it argues the Secretary has ignored the plain intent of Congress by not resolving the SOZ dispute by October 10, 1996. As discussed in section IV.A.3.a, however, Assistant Secretary Godley validly extended the deadline for the SOZ dispute until May 10, 1997. The Secretary submitted an interim deadline extension plan to Congress to comply with the requirements of § 3412(b) and to keep Congress informed. This is not indifference.

### e. Conclusion

■ Taken as a whole, the factors in the TRAC test weigh for the government. The Secretary claims she will likely make a decision by April 1997, which is less than two months away. Whatever harm Chevron is suffering (if any) will cease shortly. As discussed in section IV.A.3.a, Chevron has no right to compel a resolution until May 10, 1997. Chevron's alleged damage is speculative and entirely dependent on the outcome of the SOZ dispute. Mandamus relief against the Secretary is unwarranted. Chevron's motion for summary judgment is DENIED. The government's motion for summary judgment is GRANTED.

## B. PRELIMINARY INJUNCTION

### 1. Parties' Claims

Chevron argues that it is entitled to a mandatory preliminary injunction commanding the Assistant Secretary (through the Secretary) to: 1) issue a final determination on the SOZ participation percentage dispute; and 2) permit Chevron to receive allotments of oil consistent with the new participation percentages. It argues there is a high probability it will succeed on the merits of its claims. It also claims it will suffer irreparable harm in lost revenue if it is not granted an injunction; the balance of hardships is in its favor; and the public interest in ensuring that laws are obeyed favors it, as well.

The government responds that Chevron's proposed injunctive relief "is the equivalent

of mandamus," Prelim.Inj. Opp'n 7, and that Chevron cannot meet the demanding mandamus standard. The government argues Chevron has no likelihood of success on the merits. It also argues Chevron's injury is speculative because there is no certainty the SOZ participation percentage dispute will be resolved in Chevron's favor. In addition, it argues monetary harm alone cannot justify injunctive relief. Lastly, it argues the public interest is best served in permitting DOE, an administrative agency, to use its expertise to ensure the orderly, effective sale of NPR–1.

### 2. Proper Standard

■ "When the effect of a mandatory injunction is the equivalent of mandamus, it is governed by the same standard." *Harrell,* 52 F.3d at 1508. As discussed earlier, *Independence Mining Co.* holds that when agency action is sought to be compelled under the APA and mandamus, a court should analyze the claim under APA standards. 105 F.3d at 506–07. *Independence Mining Co.* does not discuss the proper standard for a preliminary injunction involving agency inaction. Since the factors are similar for all three types of relief (injunctive, mandamus, and APA § 706(1)), and the injunctive relief sought is mandatory, the mandamus standard shall be employed.

■ Mandamus may be granted if: 1) the plaintiff's claim is "clear and certain"; 2) the duty is ministerial and plainly prescribed; and 3) no other adequate remedy is available. *Harrell,* 52 F.3d at 1508.

### 3. Is Chevron's Claim "Clear and Certain"?

■ As discussed in section IV.A.3.a, Assistant Secretary Godley lawfully extended the deadline for the SOZ dispute until May 10, 1997. Chevron has no claim for relief until then.

### 4. Is the Secretary's Duty Ministerial?

Chevron seeks to have the Secretary decide the SOZ participation percentage dispute, not for her to necessarily adopt the IPE's recommendations or resolve the SOZ dispute in a particular way. As discussed in

section IV.A.3.a, whether the Secretary was required to decide the SOZ dispute by October 10, 1996 is not "so plainly prescribed as to be free from doubt." *Azurin v. Von Raab*, 803 F.2d 993, 995 (9th Cir.1986), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3264, 97 L.Ed.2d 763 (1987). The Secretary has no clear, non-discretionary obligation to take affirmative action which is positively commanded by an explicit statutory, regulatory, or constitutional mandate, in light of the sale suspension authority granted the Secretary. *See Independence Mining Co.*, 105 F.3d at 508–09; *Azurin*, 803 F.2d at 995. To the contrary, Congress has provided the Secretary, in consultation with the OMB Director, unilateral power to call off the sale, subject to the reauthorization of sale authority of Congress. When coupled with § 3412(i), § 3412(b)(3) is not an explicit statutory mandate in Chevron's favor. The discretionary decision whether the most advantageous sale of the government's interests in NPR–1 can be achieved has been effectively delegated by Congress to the Secretary.

### 5. No Other Adequate Remedy

#### a. Irreparable Harm

Chevron argues its economic harm is irreparable, especially since it cannot sue the government directly for delay damages under the Act. Assuming that is true,[10] that does not mean Chevron's harm is irreparable. Chevron's economic harm is speculative; its claim for the time value of money from October 10, 1996, to May 10, 1997 cannot be quantified (if at all) until and unless Chevron receives a favorable redetermination of the SOZ equity interest dispute. No party can predict with certainty the final resolution of the SOZ dispute. Chevron must prevail on the merits of the SOZ redetermination before any entitlement to the time value of money from October 10, 1996, to May 10, 1997 exists. The government is in the identical position as Chevron, should it be awarded an increased equity interest in the SOZ. In addition, Chevron's economic

livelihood is not threatened, and the Secretary's ruling is due shortly.

Chevron argues it has suffered irreparable harm because its right to "timely decision-making" was violated. Assuming such a right exists, Chevron has no such right in this case. Assistant Secretary Godley validly extended the deadline for resolution of the SOZ dispute until May 10, 1997.

#### b. Public Interest

Chevron argues the public interest is served by having the government follow the law, such as § 3412(b)(3) of the Act. The government argues the public interest is served by having all relevant technical concerns thoughtfully addressed in order to maximize the sale value of the government's interest in NPR–1.

Chevron claims that "[n]oncompliance with the law by our government officials is never in the public interest." Prelim.Inj. Reply 10. Here, the Secretary has not violated the law; the SOZ deadline was validly extended until May 10, 1997. In addition, the public interest lies in ensuring an orderly valuation process that maximizes the value of NPR–1, which is fair to both Chevron and the government.

After weighing these factors, Chevron does not have a clear and certain claim for relief. It is not entitled to mandamus relief and/or a mandatory preliminary injunction.

### V. CONCLUSION

For the foregoing reasons,

(1) Chevron's motion for a mandatory preliminary injunction is DENIED;

(2) Chevron's motion for summary judgment is DENIED; and

(3) the government's motion for summary judgment is GRANTED.

Counsel for the government shall prepare an order in conformity with this Memorandum Opinion and lodge it with the Court

---

10. At oral argument, both Chevron and the government agreed no action for delay damages was available to Chevron.

within five (5) days following date of service of this Opinion.

SO ORDERED.